**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VOLKAN TURGUT, *on behalf of himself and others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> HITACHI RAIL STS USA, INC., <br><br> Defendant. | CIVIL ACTION NO.: 1:24-cv-10660-AK |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT HITACHI RAIL STS USA, INC.'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**

Hitachi Rail chose to pay its employees on the seventh day. Its motion fails for two reasons: it has no evidence from the relevant time period that contradicts this fact, and the evidence it did file proves the opposite of its theory. From at least February 2021 until March 2024, Hitachi's biweekly pay periods closed on Fridays, and Hitachi designated the following Friday, the seventh day, as its employees' Pay Date. It printed that date on every paystub the Wage Act required it to furnish, and it instructed its payroll vendor, on the payment file itself, that the Pay Date is "the date that Hitachi has instructed [ADP] to make the funds available to the employee." SMF ¶¶ 56-57, 61, 64, 65, 112-139, 147-150. That instruction fixed the ACH effective date, and the record shows settlement and final employee control on that date, not before. SMF, ¶¶ 61-84. Plaintiff Volkan Turgut, employed by Hitachi from January 2023, alleges late payment for the 27 seventh-day pay periods from February 2023 through February 2024 (the "Complaint Period"). And when Hitachi moved the Pay Date one day earlier in March 2024, within weeks of the filing of this action, it announced the change to its entire North American workforce under the headline "Hitachi Rail <u>Employees To **Receive** Pay Checks One Day</u>

1

Earlier." SMF, ¶ 94 (emphasis added.) Hitachi has always known that the term "Pay Date" means exactly what it says: the day its employees receive their pay.

Hitachi now moves for summary judgment on the theory that its employees were in fact paid before the date it designated, printed, transmitted, and announced to its own workforce. It is worth stating plainly what the record Hitachi filed in support of that theory contains. No Schwab transaction detail from any pay period in which a violation is alleged. No testimony about any violation-period transaction. No employee-specific evidence of sixth-day wage payment availability for any pay period at issue. No corrected paystub. No communication to any employee, at any time, that the Pay Date meant an outside deadline rather than the payment date. And statements of a corporate designee who has no knowledge of any Massachusetts employee receiving pay before the Pay Date and who did nothing to find out. SMF, ¶¶ 79, 85, 152. Every transaction record Hitachi submitted is dated from March and April 2024, after Hitachi changed the operative payment instruction, and is outside the Complaint Period, as Hitachi itself acknowledges. Def. Mem. of Law at p. 4 n.2. That is not a technical defect in Hitachi's proof. It is **the** defect.

Hitachi designated the Pay Dates. ADP testified that the Pay Date is Hitachi's instruction for the day funds are to be made available to employees. SMF, ¶¶ 61-62. The bank witnesses and the Federal Reserve's own operating rules confirm that wages settle on that date and no earlier. SMF, ¶¶ 61-84. Hitachi even told its own workforce, specifically and in plain English, what the Pay Date means. On this record there is no genuine dispute that Hitachi's wage payments became final and available on the seventh day throughout the Class Period, one day past the six-day deadline this Court has already held governs. *Turgut v. Hitachi Rail STS USA, Inc.*, 768 F. Supp. 3d 200, 210-11 (D. Mass. 2025). The practice was uniform and class-wide: 44

Massachusetts employees across 76 biweekly pay periods from February 2021 to March 2024 (the "Class Period"), producing 1,667 separate employee-pay-period violations of the six-day deadline. SMF, ¶ 151.

Plaintiff accordingly cross-moves for summary judgment on liability and on Hitachi's Eighteenth Affirmative Defense. Hitachi's fallback argument, that treble damages would violate substantive due process, fails three times over. The First Circuit has already rejected a substantive due process challenge to this very trebling provision, holding the remedy is liquidated compensation, not a penalty, in a decision Hitachi never cites; the SJC decision Hitachi does cite supplies the same compensatory characterization. The proportionality authority Hitachi invokes holds that a statutory award need not be proportioned to the plaintiff's private loss. And the no-harm premise is false in any event: the statute does not condition the remedy on provable consequential harm, and Turgut suffered real economic loss all the same, lost interest and lost use of his wages with each day of delay, as his sworn supplemental interrogatory answer, served before this motion was filed, states. SMF, ¶ 141. This Court has already held that a single day matters under the Wage Act. *Turgut*, 768 F. Supp. 3d at 211. Hitachi's constitutional argument cannot be squared with it.

## FACTUAL BACKGROUND

A.  <u>Hitachi's uniform payroll calendar and its Pay Date instruction</u>

Hitachi runs one payroll process for all of its employees, through its payroll vendor ADP, and pays them by direct deposit. SMF, ¶¶ 5, 6. There was nothing unique about the payroll process for Massachusetts employees; all employees were treated exactly the same. SMF, ¶ 5. From February 2021 until March 2024 Hitachi's pay period ran from Saturday to Friday, and its Pay Dates were Fridays, seven days after each pay period closed. SMF, ¶¶ 56-57. By Hitachi's

own sworn interrogatory answer, read to and confirmed by its Rule 30(b)(6) designee, from January 2021 through February 2024 Hitachi "sent instructions to ADP to process payroll on Tuesdays, i.e. the fourth day following the end of a pay period." SMF, ¶ 9. ADP did not decide Hitachi's pay periods, Pay Dates, or pay frequency; Hitachi did. SMF, ¶¶ 54-55.

Hitachi's and ADP's designees each described what the Pay Date is. Hitachi's designee testified that the pay date is "the last possible time the banks are to get the money in their bank accounts," and that Hitachi lists it on pay stubs because "[t]hat is just the date that they're guaranteed to get their pay by." SMF, ¶¶ 59-60. ADP's designee testified that the Pay Date "is the date that Hitachi has instructed us to make the funds available to the employee," and that the "tapes" ADP transmits to employees' banks carry the account number, the amount of the deposit, and the pay date, "[b]ased on the instruction given specifically by Hitachi on which day the funds should be made available to employees." SMF, ¶¶ 61-62, 64, 108. Hitachi never instructed ADP to make any employee's wages available earlier than the Pay Date it selected; the instruction transmitted with the funds was availability on that date, not before. SMF, ¶¶ 61-65. The Pay Date is not a clerical artifact. It is Hitachi's operative payment instruction, transmitted downstream on the payment file itself.

B.  The ACH settlement mechanics and the Federal Reserve's operating rules

ADP distributes Hitachi's funds by a reverse-wire process, drawing the money from Hitachi's account and confirming receipt before sending pay instructions to the employees' banks. SMF, ¶¶ 10-11, 63. The originator of an ACH credit selects the effective date, the date it would like the entry to be settled to the client. SMF, ¶ 68. The Federal Reserve settles on that date if the entry arrives in time, and otherwise moves settlement later; it does not move entries to an earlier settlement date. SMF, ¶¶ 69-75. The receiving bank does not have the employer's

money until the Federal Reserve settles the funds to the bank's Federal Reserve account. SMF, ¶ 76.

The Federal Reserve's own operating rules confirm what the bank witnesses described. Under Operating Circular 4, the Federal Reserve accepts forward-dated ACH items only where the effective date falls within two banking days of receipt, and items outside that window are returned to the sender. SMF, ¶¶ 69-70. The window runs from the Federal Reserve's receipt of the item, not from the employer's internal payroll submission: Hitachi's Tuesday instruction went to ADP, and the entries reached the network within the window. SMF ¶¶ 69-75, 90-91. The Federal Reserve's business day runs from 3:00 a.m. on one calendar day to 2:59 a.m. the next. SMF, ¶ 73. And the earliest the Federal Reserve settles future-dated forward items is 8:30 a.m. Eastern time on the settlement date itself. SMF, ¶ 74. Under these rules, no wages Hitachi transmitted through the ACH network could settle to any employee's bank before 8:30 a.m. on the effective date Hitachi selected. Plaintiff requests that the Court take judicial notice of these publicly promulgated Federal Reserve materials, attached as Exhibits 25-26. Fed. R. Evid. 201(b)(2).

C.  Turgut's wages, the consistent records, and the March 2024 announcement

Turgut worked for Hitachi from January 2023 to April 2024 as a Senior PTC System Signaling Engineer Manager, at an annual salary of $175,000, and banked at Charles Schwab. SMF, ¶¶ 38-39, 51. Hitachi paid him on Day 7 for 27 of the 28 pay periods of his employment through February 2024. SMF, ¶¶ 84, 97. Four independent streams of contemporaneous records agree on the payment dates: Hitachi's own paystubs; Hitachi's internal payroll spreadsheets; ADP's SEP money-movement records and statistical summaries, whose check dates correspond exactly to the paystub dates; and Turgut's Schwab bank statements, which show his wages

posting on the Pay Dates. SMF, ¶¶ 78-84, 95-104, 112-139. Schwab's designee confirmed that Turgut's paychecks before March 7, 2024, settled in his account on Day 7, and that the bank statements reflect settlement, because statement transactions "are based on when the entries post" and the statement "tells you the date the Fed settled." SMF, ¶ 80. Schwab has no early pay program and never pays customers before the settlement date. SMF, ¶ 82.

On March 6, 2024, within weeks of the filing of this action, Hitachi announced to its entire North American workforce that pay dates were moving from Friday to Thursday. The announcement ran under the headline "Hitachi Rail **Employees To Receive Pay Checks One Day Earlier**," and it explained that "[b]eginning tomorrow, March 7, the pay dates for all Hitachi Rail employees in the U.S. and Canada will occur on Thursdays, giving employees a head start on weekend plans." SMF, ¶¶ 93-94 (emphasis added). Hitachi did not tell its workforce it was moving an internal deadline, or a last-pay-by date, or a label. It told them that changing the Pay Date changed the day they receive their pay.

The announcement is Hitachi's own contemporaneous statement of what its Pay Date is. If employees already had their wages in hand before the Pay Date, as Hitachi's motion now contends, moving the Pay Date up one day could not cause anyone to receive pay "one day earlier," and a Thursday Pay Date could give no one a "head start" on the weekend that a Friday Pay Date had denied them. The announcement makes sense on one reading only: employees receive their pay on the Pay Date, so a Pay Date one day earlier means pay one day earlier.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden; where it seeks judgment against the party with the burden

6

of proof, it may discharge that burden by showing an absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The Court examines the evidence in the light most favorable to the nonmoving party and does not weigh evidence or make credibility determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Conclusory allegations, improbable inferences, and unsupported speculation" do not create a trialworthy dispute. *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005).

Cross-motions do not change the standard. Each motion is evaluated separately, on its own record, with reasonable inferences drawn against the party seeking judgment. On this record the asymmetry never comes into play, because Plaintiff's cross-motion is built on facts that are undisputed and, for the most part, Hitachi's own: its records, its declaration, its sworn interrogatory answers, its payroll vendor's testimony, and the testimony of the banks it subpoenaed. The only party in this case that needs a contested inference to go in its favor is Hitachi, which asks the Court to infer violation-period compliance from post-change and out of period transactions. On Hitachi's own motion, that inference is drawn against it; on Plaintiff's cross-motion, it fails for want of the transaction-specific evidentiary foundation Rule 56 requires.

## ARGUMENT

The Wage Act required Hitachi to pay wages within six days of the termination of each pay period for employees who work five or six days per week. Mass. Gen. Laws ch. 149, § 148; *Turgut*, 768 F. Supp. 3d at 210 (seven-day provision "applies only to hourly workers who work all seven days"). Payment is complete under the Wage Act when the "recipient of the funds has some control over the funds," and the recipient is the employee. *Clermont v. Monster Worldwide, Inc.*, 102 F. Supp. 3d 353, 356 (D. Mass. 2015); (Doc. No. 65 at 4) (quoting *Clermont*); (Def. Br. 9) (same). Mere transmission is not enough. *Clermont* held the employer violated the Act where

it initiated a direct deposit on the day payment was due, knowing the employee could not access the funds until the next day. 102 F. Supp. 3d at 356-57 & n.1. And the SJC has recognized that wages cannot be considered paid unless they are paid finally and unconditionally, or "free and clear." *Awuah v. Coverall N. Am., Inc.*, 460 Mass. 484, 497 n.22 (2011) (quoting 29 C.F.R. § 531.35); *see also Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 707 (2013).

## I.    HITACHI IS NOT ENTITLED TO SUMMARY JUDGMENT

### A.  Every contemporaneous record shows that Hitachi paid Turgut on Day 7

There are two primary sources of documentary evidence in this case: Hitachi's payroll records and Turgut's bank records. Every record kept for the Complaint Period agrees that Hitachi paid Turgut on Day 7 on 27 occasions. Hitachi's records come in the form of paystubs and internal payroll spreadsheets, and they reflect the pay period, the amount paid, and the date of payment. SMF, ¶¶ 95-97, 104. ADP's records, its SEP money-movement records and statistical summaries, carry check dates and pay dates that correspond exactly to the dates on Hitachi's paystubs and spreadsheets. SMF, ¶¶ 98-103. Turgut's bank statements show his wages posting on those same dates, and Schwab's designee confirmed that the statements record the Federal Reserve's settlement date. SMF, ¶¶ 78-84. Four record streams, two of them Hitachi's, all say Day 7. SMF, ¶¶ 78-84, 95-104, 112-139.

These records are not informal notes. Hitachi's paystubs are employee-facing wage statements and payroll records generated by Hitachi's payroll process, admissible against Hitachi as statements of a party opponent and as business records. Fed. R. Evid. 801(d)(2), 803(6). And they are records the law required Hitachi to make accurately. Massachusetts law obligated Hitachi to keep "a true and accurate record" of the amount paid each employee each pay period. Mass. Gen. Laws ch. 151, § 15; 454 Code Mass. Regs. § 27.07(2). Section 148 obligated Hitachi,

"when paying" its employees, to furnish a pay slip showing, among other things, "the day, month, year." Mass. Gen. Laws ch. 149, § 148. The Attorney General, the officer charged with enforcing the wage and hour laws, states in the workplace notice state law required Hitachi to post:

**Paystub Information**                                      M.G.L. Chapter 149, Section 148
All employees must get a statement, at no cost, with their pay that says the name of the employer and employee, the date of payment (month, day, and year), the number of hours worked during the pay period, the hourly rate, and all deductions or increases made during the pay period.

SMF, ¶ 161 (construing § 148's requirement to furnish a pay slip showing "the day, month, year" as requiring the pay slip to show the "date of payment"); Mass. Gen. Laws ch. 151, § 16; 454 Code Mass. Regs. § 27.07(1). That construction "is entitled to substantial deference, at least where it is not inconsistent with the plain language of the statutory provisions." *Camara v. Attorney Gen.*, 458 Mass. 756, 759 (2011) (quoting *Smith v. Winter Place LLC*, 447 Mass. 363, 367-368 (2006)). Federal law separately required Hitachi to preserve a payroll record of the "date of payment and the pay period covered by the payment," 29 C.F.R. § 516.2(a)(12), for exempt and non-exempt employees alike, *see* 29 C.F.R. § 516.3 (requiring all § 516.2(a) items except paragraphs (a)(6) through (10)). If Hitachi believed its employees were actually paid on Day 6, these statutes obligated it to record and communicate Day 6 as the date of payment. It did not. It printed Day 7, transmitted Day 7, and announced that moving the Pay Date meant pay arriving one day earlier.

Hitachi has also stipulated that its payroll records are "true, correct, and authentic documents." SMF, ¶ 104. Records that the law requires to state the date of payment, and that the employer stipulates are correct, establish the date of payment. Judicial admissions are "formal concessions in the pleadings or stipulations by a party or its counsel, that are binding upon the party making them." *Costello v. Molari, Inc.*, 2019 U.S. Dist. LEXIS 200995, at *8 (D. Mass.

9

Nov. 20, 2019) (quoting *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995)). Hitachi cannot stipulate to the correctness of its statutorily mandated payment-date records and then ask this Court to treat those same records as systematically wrong.

B.  Hitachi cannot impeach the payment-date records the law required it to keep

Even without the stipulation, Massachusetts law does not permit an employer to defeat a wage claim by disowning its own statutorily required records. In *Donis v. American Waste Services, LLC*, the Appeals Court rejected an employer's attempt to prove that its own contemporaneous records overstated the hours its employees worked: the defendants "cite no case that has interpreted *Anderson* to allow an employer to challenge the reliability of its own, facially adequate records," and permitting that challenge "on a post hoc basis despite the existence of contemporaneous time and payroll records" would "subvert the legislative purpose behind the Wage Act," which exists "to provide strong statutory protection for employees and their right to wages." 95 Mass. App. Ct. 317, 329 (2019) (quoting *Crocker v. Townsend Oil Co.*, 464 Mass. 1, 13 (2012)), rev'd on other grounds, 485 Mass. 257 (2020). The SJC later reversed on a different, limited statutory-remedy question, whether a Prevailing Wage Act rate underpayment could be recovered through the Wage Act's private right of action; its grant of further appellate review was limited to that question, and it did not address, much less reject, the Appeals Court's recordkeeping analysis. *See* 485 Mass. at 260, 265-70. Indeed, the SJC's decision reaffirmed that the Wage Act's own office is to prevent the unreasonable detention of wages, the precise violation alleged here. *Id*. at 263-64. The same anti-recharacterization principle runs through other subsequent SJC holdings in *Sullivan* and *Sutton*: employers may not retroactively redesignate payroll entries to satisfy wage obligations after the fact. *Sullivan v. Sleepy's LLC*, 482 Mass. 227, 233, 236 (2019); *Sutton v. Jordan's Furniture, Inc.*, 493 Mass.

728, 736-37 (2024) (applying the rule "regardless of whether the allocation is retroactive"). These cases do not hold that paystub labels always control over proven reality; Plaintiff needs no such rule. They hold that Massachusetts wage law does not permit an employer to use after-the-fact payroll characterization to erase statutory violations. For years, Hitachi communicated one thing to its employees, on every paystub, every pay period: wages pay on the Pay Date. It never told anyone, in any document in this record, that the printed date was an outer deadline rather than the payment date. Its litigation reinterpretation of its own mandated disclosures is precisely the post hoc recharacterization these cases forbid. And the reinterpretation would not help Hitachi even if it were permitted: a guarantee that wages arrive by Day 7 is not a Wage Act defense for employees entitled to payment by Day 6. It is a payroll schedule set one day outside the statutory deadline.

Federal summary judgment practice bars the same move on independent grounds. Hitachi's operative facts in this case are its own: its Rule 56.1 statement and its designee's declaration present the Friday Pay Date as the governing fact. *See* SMF ¶¶ 7, 56-57; Aurin-Davies Decl. ¶ 5, and its designee gave clear answers to unambiguous questions, disclaiming any knowledge of any employee receiving pay before the Pay Date. SMF, ¶152. A party "cannot create a conflict and resist summary judgment" with later assertions that are "clearly contradictory" to its prior sworn testimony, absent a satisfactory explanation of the change. *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994); *see Gendron v. Kinjawi*, 2025 WL 604954, at *1 & n.1 (D. Mass. Feb. 25, 2025) (treating admitted facts as undisputed where later efforts to walk them back were "legal arguments, not facts").

Nor can Hitachi convert the problem into a harmless recordkeeping error. If the stubs did not record the actual payment date, there is no election between violations: § 148 imposes strict

liability for late payment, *Dixon v. City of Malden*, 464 Mass. 446, 452 (2013), and a recordkeeping violation is neither a defense to late payment nor a substitute for it. And the concession destroys the evidentiary position Hitachi needs. An employer that disowns its paystubs concedes it kept no accurate contemporaneous record of the one fact this case disputes, the date of payment, and the burden framework in wage cases exists to protect employees from an employer's failure to keep proper records: the employee's proof carries as a just and reasonable inference, and the employer must come forward with precise evidence of the true facts. *Donis*, 95 Mass. App. Ct. at 328-30; *see Devaney v. Zucchini Gold, LLC*, 489 Mass. 514, 527-28 (2022) (adopting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)). Hitachi has produced no violation-period evidence of any payment date other than the one on its paystubs, and its designee disclaimed the knowledge to supply any. What Hitachi has produced instead is a post-suit reinterpretation of its own required payment-date records, supported by post-change transactions generated under a different Pay Date. That is not substance over form. It is speculation over records. The consequence runs in one direction on both motions: on Hitachi's motion, the records defeat the contention that the Pay Date recorded something other than payment; on Plaintiff's cross-motion, they affirmatively establish the operative dates from records whose accuracy Hitachi was legally obligated to maintain and is legally barred from disputing.

C.  The post-change Schwab records prove the mechanism, not compliance

Hitachi's only Schwab transaction details depict transactions from March and April 2024, outside the Complaint Period, after Hitachi changed the operative payment instruction. SMF, ¶ 85. Plaintiff's counsel objected at the Schwab deposition that those records fall outside the period at issue. SMF, ¶ 86. Hitachi's counsel then began to ask Schwab's designee whether

12

records from February 2024, inside the Class Period, would look the same, and withdrew the question before she could answer. SMF, ¶ 88. That absence is not unexplained. Hitachi attributes it to a supposed two-year retention limit, citing a letter from Schwab's outside counsel. (Def. Br. 6 n.3.). Hitachi's effort to lay the gap at Plaintiff's feet (Def. Br. 2 n.1, 6 n.3) fails on either of the two retention premises in the record. On the sworn one, Schwab keeps the relevant records about ten years, they exist today, and Hitachi, holding this Court's January 23, 2026, order authorizing Requests 3 through 7 "from February 2021 to the present" (Doc. No. 65 at 4), never went back for them. SMF, ¶ 92. On the other, the dispositive delay was Hitachi's own: the scheduling order issued in July 29, 2025, (Doc. No. 39), and Hitachi waited until late December 2025 to serve the subpoena, while class-period records aged out month by month on its own theory. Plaintiff's motion for a protective order, granted in part, occupied roughly a month of that timeline; the Court resolved it on January 23, 2026, four days after the subpoena's January 19 return date, and changed nothing about what Hitachi could have obtained. (Doc. No. 65; Def. Br. 6 n.3.). A party cannot manufacture an absence of evidence through its own delay and then offer the absence as proof.

The inference Hitachi requests from the post-change records is backwards in any event. Hitachi argues that because payroll was submitted on Tuesdays, in the Class Period and the post-change period alike, the March and April 2024 evidence "illustrates" that Plaintiff's core theory "is wrong." (Def. Br. 11.) An illustration is not a record. The constant across the two periods was the Tuesday submission; the variable that changed was the effective date Hitachi designated, from the seventh day to the sixth. Schwab credits ACH deposits on the settlement date, the effective date is the date the originator selects for settlement, and the Federal Reserve settles on that date or later, never earlier. SMF, ¶¶ 68, 75, 77. Under the same mechanics, a Class Period

entry carrying Hitachi's Friday effective date settles and posts on that Friday. Day 7. If the post-change records illustrate anything, it is that posting occurs on the date Hitachi picks, whichever date that is.

Hitachi's timestamp argument reads a computer clock as a payment event, and it fails on the face of Hitachi's own exhibits. SCHW_000002 states a Posting Date and an Effective Date of 03/21/2024; SCHW_000004 states a Posting Date and an Effective Date of 04/04/2024. *See* Exs. 13, 16. Those are the Pay Dates. Schwab's designee explained that the late-evening timestamps reflect the nightly batch: Schwab's system batches around 8:00 p.m. Eastern, "the business day is already done for that specific banking day," and entries processed after the batch belong to the next business day. SMF, ¶ 89. On redirect, Schwab confirmed that funds are made available "when the funds are posted based on settlement date, not when they're received," and that the transactions "are posted on the days that the originator intended." SMF, ¶ 83.

Worse for Hitachi, the Federal Reserve's rules close the door: the earliest it settles forward-dated items is 8:30 a.m. on the settlement date, so funds could not have settled at 9:58 p.m. the night before. SMF, ¶ 74.

D.  <u>Receipt by the employee's bank is not control by the employee</u>

Hitachi's lead argument reads Clermont's word "recipient" to mean Schwab: because Schwab "received" something in the early morning of March 20 and April 3, "control over Hitachi Rail wages transferred to Plaintiff" before the Pay Date. (Def. Br. 1, 10-11.) The record Hitachi cites refutes the premise. SCHW_000001, the March 20 "receipt" document, is a non-monetary transaction detail. Schwab's designee described it as the system documentation of receiving the entry for processing, and was explicit about what it is not: "notice there's no monetary value here. This is not passing any funds. It's a system record of instruction." SMF, ¶

90. What Schwab logged at 2:42 a.m. was an instruction in transit, and the instructions themselves direct Schwab to post on the settlement date. SMF, ¶ 91. An employee has no control, of any kind, over an unposted entry sitting in his bank's processing system. He cannot withdraw it, transfer it, or spend it, and Schwab will not credit it to him until the settlement date Hitachi chose. SMF, ¶¶ 77, 82-83.

*Clermont* itself rejected the theory Hitachi now runs through ADP. The employer there initiated the electronic transfer on the operative date and was held in violation anyway, because initiating the transfer gave the employee no control; he could not access the funds until the following day. 102 F. Supp. 3d at 356-57 & n.1. Starting the payment process is not paying. Hitachi's Tuesday submission to ADP is that same initiation, three steps removed from Turgut's account, and it moved nothing to him.

The check analogy from *First National* does not bridge the gap. *First Nat'l Ins. Co. of Am. v. Commonwealth* held that payment by check is made when the check is drawn on an account with sufficient funds at a solvent bank and delivered to the payee. 391 Mass. 321, 326-27 (1984). Delivery of a physical check is what completes payment under that rule: it places a negotiable instrument, backed by sufficient funds, in the payee's hands, something he can endorse, deposit, or cash. By contrast, a pending ACH entry places nothing in the employee's hands; it sits at the bank, invisible and untouchable, awaiting the settlement date **its originator specified**. *First National* itself separates the mechanical moment of payment from satisfaction of the underlying obligation: "an underlying debt may not be discharged unless payment is accepted." *Id.* at 326. The ACH equivalent of delivering the instrument is settlement, the moment the funds become the employee's. Contrary to what Hitachi argues, *Tranfaglia v. City*, 2025 WL 1147513 (Mass. Sup. Ct. Mar. 10, 2025), is the opposite of this case. There, on Hitachi's own

description, the delay arose on the bank's side of a completed transfer. (Def. Br. 11-12.) Also, of note, the *Tranfaglia* Court specifically noted that the "record is silent as to why Tranfaglia's chosen bank would not release funds." *Id.* Here, nothing reached Schwab before the Pay Date except a non-monetary entry, and Schwab acted precisely when Hitachi's instruction told it to act. Hitachi transmitted funds with an instruction not to release them until Day 7; its conduct is a post-dated check, not a completed delivery, and the record here establishes that the funds did not arrive to Turgut because that was Hitachi's specific banking instructions. Hitachi blames Schwab for not releasing Turgut's funds early while eliding the fact that Schwab was following Hitachi's own instructions.

E.   Hitachi's "no credible evidence" argument inverts Rule 56

Hitachi closes by contending Turgut has "no credible evidence" he was paid on the Pay Date because his bank statements do not show receipt and posting times. (Def. Br. 13-14.) Credibility determinations belong to the factfinder, not to a movant's brief. *Anderson*, 477 U.S. at 255. The bank statements Hitachi disparages are, per Schwab's own designee, records of the settlement date: statement transactions "are based on when the entries post," and the statement "tells you the date the Fed settled" because Schwab "post[s] on settlement date." SMF, ¶¶ 80, 83. The statements do not purport to record receipt times, and nothing in the Wage Act turns on receipt times; they record the day payment was completed, which is the only day that matters. Nor do the statements stand alone: Turgut's paystubs state the Pay Dates and are Hitachi's own stipulated business records, and the ADP statistical summaries state the effective dates Hitachi transmitted. SMF ¶¶ 98-103. And the premise is outdated: Hitachi's "only evidence" assertion rests on Turgut's initial interrogatory answers, served in January 2026, before any deposition in this case had been taken. The depositions followed in April and May 2026, and the record now

16

includes the testimony of Schwab's, Citizens', and ADP's designees, and Hitachi's own Rule 30(b)(6) admissions. A movant cannot establish the absence of evidence by citing an answer that predates the evidence. On this record, Hitachi has not carried a movant's initial burden, because it has identified no absence of evidence; the evidence is abundant, uniform, and largely Hitachi's own. At minimum, a reasonable jury could find on this record that Hitachi paid Turgut on Day 7 in violation of § 148. In truth, as Part III.B shows, no reasonable jury could find otherwise. Hitachi's motion should be denied.

## II. THE DISPUTES HITACHI ASSERTS ARE IMMATERIAL TO PLAINTIFF'S CROSS-MOTION

Plaintiff's cross-motion does not depend on resolving anything Hitachi characterizes as disputed. This is so because each purported dispute Hitachi has raised or may raise is immaterial to the cross-motion for at least one of the following reasons:

1. The Schwab transaction details and their timestamps concern March and April 2024 transactions, processed under a Thursday instruction; they are not evidence of any Class Period payment, and a fact that concerns only transactions not at issue cannot be material. *Anderson*, 477 U.S. at 248.

2. Even credited in full, the timestamp reading establishes at most when Schwab's system logged an entry, not when wages became Turgut's to control; under *Clermont*, *Awuah*, and the settlement mechanics of the Federal Reserve, control passes at settlement, so the fact does not affect the outcome under the governing law.

3. Bank early-availability programs, even where they exist, are the receiving bank's provisional credit of its own money, not the employer's payment of wages, as Part III.C establishes; whether any bank offered one is therefore legally irrelevant to Hitachi's compliance.

4.  Hitachi's "last pay by" gloss on its own records is a legal characterization, not a fact, and a party's arguments about its admitted records are "legal arguments, not facts." *Gendron*, 2025 WL 604954, at *1 n.1.[1]

5.  Hitachi's Rule 30(b)(6) designee disclaimed knowledge of any Massachusetts employee receiving pay before the Pay Date (SMF, ¶ 152) so there is no competent evidence on the other side of the operative facts at all, and a genuine dispute requires evidence, not conjecture. *DePoutot*, 424 F.3d at 117.

The facts that carry the cross-motion, the designated Friday Pay Dates, the uniform Tuesday instruction, ADP's transmission of the Pay Date as Hitachi's availability instruction, settlement on the effective date and no earlier, and posting on settlement, come from Hitachi's own records, Hitachi's own sworn answers, and the witnesses Hitachi subpoenaed. They are undisputed, and none of the matters Hitachi contests touches them.

## III.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT

### A.  The cross-motion is properly before the Court

Turgut moves for summary judgment in his individual capacity, with the motion for class certification fully briefed and pending. (Docs. 78, 82.) As a general rule, certification should be resolved before the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). But the rule is a procedural preference, not a jurisdictional bar, and it exists for a defendant's benefit: it protects defendants from "one-way intervention," under which absent class members could await a favorable merits ruling before electing to remain in the class. Because the protection is the defendant's, the defendant may waive it and elect to have the merits decided first. *Postow v.*

---

[1] In fact, the record forecloses the characterization. Under the Federal Reserve's operating rules, funds cannot settle before the effective date the originator designates; the Pay Date is therefore the first day wages could arrive, not an outer deadline. SMF, ¶¶ 68-77, 82-83. A 'no later than' date describes a system that cannot exist.

*OBA Fed. Sav. & Loan Ass'n*, 627 F.2d 1370, 1382-83 (D.C. Cir. 1980); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 762 (3d Cir.) (*en banc*), cert. denied, 419 U.S. 885 (1974). Judges in this District have applied the same rule, proceeding to summary judgment with certification pending where the defendant elected a merits-first course. *Vander Luitgaren v. Sun Life Assur. Co. of Can.*, 966 F. Supp. 2d 59, 61 n.2 (D. Mass. 2012).

Hitachi has made that election here. It did not merely file a Rule 56 motion on the schedule this Court set; it sought outright judgment of "no liability and no damages" on the named plaintiff's claim while the certification motion was fully briefed, without asking the Court to resolve certification first, as a defendant invoking the protection would. (Def. Br. 15.) And Hitachi's opposition to class certification itself puts the merits before the Court: it argues Turgut is an inadequate class representative because "he has no Wage Act claim as a matter of law," relying on its summary judgment motion. (Doc. No. 82 at 12, citing Doc. No. 81.) A defendant that asks the Court to weigh the merits of the named plaintiff's claim in deciding certification, and to enter judgment against him while certification is pending, has elected merits-first adjudication. It cannot claim the shelter of a sequencing preference it has twice asked the Court to disregard, and invoke it only against the half of the merits record that favors the plaintiff.

Plaintiff's cross-motion rests on the same record as Hitachi's motion and can be decided with it. After a ruling on certification, Plaintiff requests that summary judgment on liability enter for the class as well, on the same common record. And the sequencing remains the Court's to manage: the Court may resolve certification and the cross-motions simultaneously, or defer entry of any individual judgment until certification is decided, and Plaintiff consents to either course.

B.  The undisputed record establishes every element of liability

The elements are few. Section 148 required Hitachi to pay each Massachusetts employee within six days of the close of each pay period; the six-day deadline governs because every Massachusetts employee was expected to work a full five-day week, none regularly worked seven days or fewer than five, and this Court has already so construed the statute. Mass. Gen. Laws ch. 149, § 148; *Turgut*, 768 F. Supp. 3d at 210-11; SMF, ¶¶ 142-144. Payment is complete when the employee receives control over the funds, not when the employer sets its payroll machinery in motion. *Clermont*, 102 F. Supp. 3d at 356-57. The statute imposes strict liability; intent, good faith, and administrative custom do not excuse late payment. *Dixon*, 464 Mass. at 452; *Reuter*, 489 Mass. at 468-74.

The record answers each element without a contested inference. Hitachi designated the seventh day as the Pay Date throughout the Class Period and instructed ADP accordingly on Tuesdays. SMF ¶¶ 54, 56-57, 145, 151. ADP carried the instruction to the banks on the tape itself. SMF, ¶¶ 64, 108. The Federal Reserve settled on the effective date Hitachi selected, never earlier, and no earlier than 8:30 a.m. on that date, and the banks posted on settlement. SMF, ¶¶ 74-77, 82-83. The class-period documents show the instruction in operation: the ADP statistical summaries include the pay period ending May 12, 2023, with a Pay Date of May 19, 2023, day seven, and Hitachi's own designee, examining pay statements for that period, agreed the Pay Date falls seven days after the period closed, both for Turgut and for two other Hitachi employees whose statements carry the same dates. SMF, ¶¶ 105-111. Hitachi told its entire workforce that moving the Pay Date meant receiving pay one day earlier. SMF, ¶ 94. And Hitachi has no class-period transaction record, and no witness, placing control of any employee's wages in the employee's hands by the sixth day. SMF, ¶¶ 85, 152. Hitachi's own exhibits supply

20

the final confirmation: the Schwab transaction details Hitachi filed display an "Effective Date" field reading 03/21/2024 and 04/04/2024, the Pay Dates themselves, and Schwab's designee stated the consequence in one sentence: "the transactions are posted on the days that the originator intended." SMF, ¶¶ 83, 87. The instruction Hitachi transmitted through ADP told the ACH network to settle each employee's wages on the Pay Date, and during the Class Period that date was the seventh day.

Payment one day late is payment late. *Reuter*, 489 Mass. at 470-74. Each biweekly pay period paid on the seventh day was a discrete violation. This Court has already held the day matters. *Turgut*, 768 F. Supp. 3d at 211. Even with every reasonable inference drawn in Hitachi's favor, no genuine dispute remains, and Plaintiff is entitled to summary judgment on liability for himself and, upon certification, for the class.

C.  Bank early-availability programs are bank credit, not Hitachi's payment

Hitachi's interrogatory answer attributes the timing of Turgut's pay to "his choice to bank with Charles Schwab" and names six banks at which he supposedly "could have withdrawn his wages before Friday." SMF, ¶ 153. Because Hitachi has signaled it will press the same theory against the class, Plaintiff addresses it squarely.

First, the wages were not there to withdraw: the money becomes the employee's on the settlement date and no sooner. What some banks offer before that date is a different transaction by a different actor. Citizens' designee described it precisely: under the bank's Paid Early program, Citizens, which "hasn't received the funds yet from the Fed, is posting the money to our customer, the employee," as "a customer benefit" the bank chooses to confer, bearing its own float, with every ACH item provisional until the morning of the effective date, when final

payment occurs. SMF, ¶¶ 154-158. Originators like Hitachi have no role in the program, no advance knowledge of whether it will apply, and consumers are not guaranteed it. SMF, ¶ 159.

Next, Massachusetts law has a name for what the employee holds during that interval, and it is not wages. "A provisional credit is not an advance payment of the presented check; rather, it is similar to a loan." *Gossels v. Fleet Nat'l Bank*, 453 Mass. 366, 374 (2009). The Uniform Commercial Code makes any credit a collecting bank extends before final settlement provisional, G. L. c. 106, § 4-201, and gives the bank the right to charge it back if settlement fails, G. L. c. 106, § 4-214. Citizens' deposit agreement carries the point to its conclusion: absent final settlement, Citizens is entitled to a refund and "the party making payment to you via such ACH credit (i.e., the originator of the ACH credit) shall not be deemed to have paid you in the amount of such ACH credit." SMF, ¶ 160. A revocable advance of the bank's own money, extended at the bank's option and recoverable from the employee, is bank credit against wages. It is not the employer's payment of wages, which must arrive finally and unconditionally, or "free and clear." *Awuah*, 460 Mass. at 497 n.22; *Fraelick*, 83 Mass. App. Ct. at 707.

If Hitachi answers that this analysis elevates form over substance, it has the substance backwards. The substance of an early-availability credit is a loan: someone else's money, advanced at that party's option, provisional until the morning of the effective date, and recoverable if settlement fails. The substance of Hitachi's conduct is its instruction, and the instruction said Day 7. Plaintiff's case looks through every form to the same substance: whose money, on what conditions, arriving when. The answer, at every link in the chain, is Hitachi's money, unconditionally, on the day Hitachi chose. Nor does Hitachi improve its position by observing that it "never instructed ADP to preclude banks from making wages available" before the Pay Date. SMF ¶¶ 14-15, 61-65. The Wage Act imposes **an affirmative duty on the**

22

**employer** to pay by the deadline; it does not ask whether the employer forbade a third party from advancing that party's own money. The availability ADP described as resting with the banks is precisely the **discretionary provisional credit** Citizens described: the bank's funds, extended at the bank's option, revocable until settlement. SMF, ¶¶ 154-158. The instruction Hitachi did transmit, carried on the tape itself, designated the Pay Date as the day the funds were to be made available and fixed the settlement date accordingly. SMF, ¶¶ 61-64. An employer does not satisfy a statutory payment deadline by declining to prohibit a loan someone else might choose to make. The theory also has no facts to support it: Hitachi's designee does not know whether the banks its answer names release funds early, has no knowledge of any Massachusetts employee receiving pay before the Pay Date, and did nothing to confirm when employees receive their pay. SMF, ¶¶ 152-153. And it is legally irrelevant in any respect, which is why it poses no obstacle to class-wide adjudication: the Wage Act places the payment obligation on the employer and permits no arrangement to exempt the employer from it, *Awuah*, 460 Mass. at 492-93, and Hitachi's employer-side act that caused payment, its settlement instruction, was the same for everyone. The same late instruction cannot be lawful as to one employee and unlawful as to another because of banking arrangements Hitachi neither controlled, nor knew of, nor can identify a single instance of.

D.  The due process defense and Affirmative Defense No. 18 fail as a matter of law

Hitachi's constitutional theory assumes that § 150's mandatory trebling is a penalty whose size must be measured against Turgut's provable consequential harm. The First Circuit has already rejected the characterization on which that theory depends, **in a case Hitachi avoids**. In *Matamoros v. Starbucks Corp.*, the employer argued that § 150's post-2008 mandatory trebling "transgresses due process by requiring the automatic imposition of punitive damages

23

without a finding of reprehensibility." 699 F.3d 129, 140 (1st Cir. 2012). The court rejected the challenge at the threshold, without reaching any proportionality analysis: the jury-punitive-damages doctrine of *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), is "inapposite" to a fixed multiplier that "reflects a reasoned legislative judgment"; the Legislature denominated the remedy liquidated damages; such damages "constitute[] compensation for the retention of a workman's pay which might result in *damages too obscure and difficult of proof for estimate other than by liquidated damages*"; and "[b]y definition, therefore, liquidated damages are not punitive damages." *Id*. at 140 (emphasis added) (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945)). Treble damages under the current Wage Act are "neither an award of punitive damages nor fairly analogous to such an award," and the employer's "due process concerns" were therefore "misplaced." *Id*. at 140. Hitachi's challenge arrives in different packaging, proportionality rather than reprehensibility, but it rests on the identical predicate: that the trebled award is a penalty to be measured against the plaintiff's private loss. A remedy that is neither punitive, nor fairly analogous to punitive damages, supplies no subject for penalty-proportionality review, however the challenge is framed. Whether measured against *Campbell*'s reprehensibility guideposts or *Williams*'s proportionality ceiling, the analysis never begins, because both doctrines regulate penalties, and this remedy is not one.

The SJC has said the same, grounding that characterization in the Legislature's deliberate 2008 amendment making trebling mandatory. *George v. Nat'l Water Main Cleaning Co.*, 477 Mass. 371, 374-80 (2017) (construing treble damages under § 150 as liquidated rather than punitive). The Legislature rejected proposals that would have limited treble damages to willful or bad-faith violations, choosing strict liability and a fixed liquidated measure instead. *Id*. at 374-

24

75. *Missel* explains why the remedy is compensatory: the retention of wages may cause harms "too obscure and difficult of proof" to measure with precision, so the law fixes the compensation in advance. *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583-84 (1942); *see Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945). *George* adopted that rationale for § 150, and *Reuter* applied it to late-paid wages, holding that the damages are the late-paid wages themselves, trebled. *George*, 477 Mass. at 376, 380; *Reuter*, 489 Mass. at 470-74. Hitachi's own memorandum adopts the compensatory frame: it quotes *George*'s description of the remedy as liquidated damages for the consequences of delay and concedes those damages are "difficult to quantify with precision." (Def. Br. 14.) What it **never** does is mention *Matamoros* or engage the characterization's consequence. Indeed, Hitachi's memorandum never once describes § 150's remedy as a penalty. Hitachi asks for penalty-proportionality review of a remedy it nowhere contends is a penalty.

The statutory architecture confirms it: chapter 149 contains a penalty regime, and it is not § 150. Section 27C houses the public enforcement machinery of criminal fines and civil citations, while § 150 creates the private employee remedy and names it liquidated damages. Mass. Gen. Laws ch. 149, §§ 27C, 150; *Melia v. Zenhire, Inc.*, 462 Mass. 164, 170-71 & nn.6-8 (2012). *Williams* proportionality review is a doctrine about penalties. Once § 150's remedy is understood as what the First Circuit and the SJC say it is, the constitutional question Hitachi poses never arises.

The no-harm premise fails on the record and measures the wrong injury. Hitachi measures treble wages against downstream defaults Turgut did not suffer, missed housing, food, utility, and credit card payments. SMF ¶¶ 40-48; Def. Br. 14-15. *Reuter* holds that for late-paid wages the statutory loss is the late-paid wages themselves. 489 Mass. at 470-74. The stipulation

25

says Turgut did not miss enumerated bill payments; it does not say he lost no use of his wages. Nor did it concede anything Plaintiff ever claimed. As this Court's order on the Schwab subpoena notes, Plaintiff stated months before this motion that he seeks "statutory damages under the Wage Act; the statute's mandatory remedy for unpaid wages, not consequential damages for financial hardship or other losses." Doc. No. 65 at 3, quoting Doc. No. 58 at 9. The same order identifies the base on which the remedy operates: treble damages "must be based upon some underlying amount of lost wages and other benefits." Doc. No. 65 at 3. Hitachi's motion thus disproves a category of damages Plaintiff expressly disclaimed and leaves untouched the statutory measure he actually seeks. Massachusetts law forecloses the premise independently: a violation of the Wage Act results in damages. *Dixon v. City of Malden*, 464 Mass. 446, 452 (2013). The employer there argued that the employee suffered no damages because payments he received after termination exceeded the wages owed; the SJC held the employee "has incurred damages under the terms of the statute" because he was not paid what he was owed when the statute required. *Id*. at 452-53. The injury the Wage Act defines is measured by the timing of payment, not by the employee's downstream financial condition. And Hitachi's the premise is false in any event. Turgut's sworn supplemental answer, served April 24, 2026, before this motion was filed, states the deprivation directly: each day his wages went unpaid was a day they could not accrue interest in his Schwab checking account and a day he was deprived of their use for his customary, immediate transfers to his Schwab brokerage account. SMF, ¶ 141. Those losses are not the measure of damages, because Section 150 and *Reuter* set the measure; they refute the assertion that the deprivation was harmless. Hitachi's declaration that "there is no difficulty quantifying damages with precision: there are none" (Def. Br. 15) was

26

contradicted by a sworn answer sitting in its own files and by its own memorandum one page earlier, which concedes these damages are "difficult to quantify with precision." (Def. Br. 14.)

The concession reveals the flaw in the whole argument. The difficulty of precise quantification is not a constitutional defect in the remedy; **it is** the reason the Legislature liquidated it. The origin of that rationale confirms it. In *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945), superseded on other grounds by statute, Portal-to-Portal Act of 1947, Pub. L. No. 80-49, 61 Stat. 84, the employee had received his wages in full, two years late, before he filed suit; the Supreme Court nonetheless affirmed recovery of the full liquidated amount, because "liability is not conditioned on default at the time suit is begun." *Id*. at 711. Delay is the injury the liquidated remedy compensates, whether or not the wages eventually arrive. *Id*. at 707. The SJC adopted precisely this rationale for Section 150. *George*, 477 Mass. At 376 (2017); *Reuter*, 489 Mass. at 470 (2022). Hitachi's syllogism converts the rationale for liquidated damages into a demand for the itemized proof of loss that liquidated damages exist to dispense with. The relief Hitachi requests shows how far the argument reaches: its motion asks the Court to hold that "[a]ny [d]amages [a]warded" for an adjudicated violation would be unconstitutional (Def. Br. 14), a rule under which no employee who managed to stay current on his bills could ever enforce the Wage Act at all. Hitachi's theory would also make the Act depend on personal financial resilience, a wealth-indexed exception to a bright-line timing rule that the Appeals Court has already rejected as arbitrary. *Okerman v. VA Software Corp.*, 69 Mass. App. Ct. 771, 778 (2007). As this Court put it, a day matters "for the many people in this Commonwealth who live paycheck to paycheck." *Turgut*, 768 F. Supp. 3d at 211.

Even under *Williams*, the defense fails, and *Tenenbaum* shows why. The standard is extraordinarily deferential: a statutory award stands unless "so severe and oppressive as to be

wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919). *Williams* itself shows how far the deference extends: the railroad there overcharged two passengers sixty-six cents apiece and was penalized $75 per violation, **a sanction on the order of one hundred times the actual loss**, and **the Supreme Court sustained it**, noting the "wide latitude of discretion" states possess in fixing the consequences of violating their laws. *Id*. at 66-67. Applying that deference, the First Circuit sustained $675,000 in statutory damages against an individual noncommercial infringer, quoting the very sentence of Williams that answers Hitachi here: a statutory award need not "be confined or proportioned to [the plaintiff's] loss or damages; for . . . the Legislature may adjust its amount to the public wrong rather than the private injury." *Sony BMG Music Entm't v. Tenenbaum*, 719 F.3d 67, 70 (1st Cir. 2013) (quoting *Williams*, 251 U.S. at 66). Section 150 is more tethered on every axis: a fixed three-to-one liquidated multiplier applied to wages the employee actually earned and the employer paid late. In this case, the statute fits the conduct directly. The Legislature targeted the late payment of wages by employers, even when the delay is only one day, because employees often depend on prompt payment for daily support. *Reuter*, 489 Mass. at 468-69 (quoting *Commonwealth v. New York Cent. & H.R.R.R. Co.*, 206 Mass. 417, 424 (1910)); *Fraelick*, 83 Mass. App. Ct. at 704 ("The legislative intent, again, is to prevent the unlawful detention of wages"); *Turgut*, 768 F. Supp. 3d at 211.

Here, for purposes of Hitachi's own argument, that is exactly what happened: wages were detained. Hitachi has not explained why due process would tolerate the award in *Williams*, roughly **one hundred times** the passengers' loss, and the award in *Tenenbaum*, some **fifteen hundred times** the infringer's own estimate of the harm, yet forbid a fixed treble of the wages themselves for the very conduct the Legislature meant to reach. Accepting Hitachi's theory

28

would also transform the Wage Act from a bright-line payment command into a forensic audit of employee personal finances, with discovery in every wage case reaching rent, mortgages, medical bills, credit balances, savings, brokerage holdings, and household income, none of which the statute asks. And it would perversely reward breadth of violation: under Hitachi's framework, an employer who violated the Act for years across dozens of employees would gain a constitutional defense from the very scale of its noncompliance, while the employer who fixed its payroll after one period would face the largest proportional exposure. The Wage Act rejects that outcome. *Reuter*, 489 Mass. at 469, 471-72.

Affirmative Defense No. 18 fails with its premises. Rule 56(a) permits summary judgment on "a claim or defense . . . or the part of each claim or defense." Fed. R. Civ. P. 56(a). As pleaded, the defense asserts that Hitachi promptly paid full wages after every payroll period, that trebling would be severe and oppressive, and that neither Plaintiff nor the putative class suffered any harm. The first premise is the liability question and dies with it; to the extent it rests on bank early-availability programs, the banks themselves refute it for the reasons in Part III.C. The second and third premises fail for the reasons above. The defense's class-wide framing adds nothing: § 150 expressly authorizes an employee to sue "for himself and for others similarly situated," *Lipsitt v. Plaud*, 466 Mass. 240, 247-48 (2013); *Gammella v. P.F. Chang's China Bistro, Inc.*, 482 Mass. 1, 10-11 (2019), and aggregate exposure is the arithmetic of a fixed statutory formula applied to repeated violations, not a constitutional defect. The judgment Matamoros affirmed while rejecting the due process challenge exceeded $14 million, awarded to a class under this same provision. 699 F.3d at 133, 140. Summary judgment should enter for Plaintiff on Affirmative Defense No. 18.

## DISPOSITION AND RELIEF REQUESTED

Plaintiff respectfully requests that the Court:

(1) deny Hitachi's motion for summary judgment;

(2) grant Plaintiff summary judgment on liability under Mass. Gen. Laws ch. 149, § 148, for each biweekly pay period from February 2023 through February 2024 in which the designated Pay Date fell on the seventh day after the close of the pay period, and, upon certification, for the class;

(3) enter summary judgment for Plaintiff on Hitachi's Eighteenth Affirmative Defense;

(4) award Plaintiff Turgut treble liquidated damages pursuant to Mass. Gen. Laws ch. 149, § 150, and *Reuter v. City of Methuen*, 489 Mass. 465, 476 (2022) ("The remedy for late payment is . . . the trebling of the late wages."), on the wages paid late in each violation pay period ($178,415.25) in single, calculated from Hitachi's own payroll records, SMF ¶ 140, and enter judgment accordingly, with reasonable attorneys' fees and costs to be sought by separate petition under § 150; and

(5) (5) upon certification and following notice and the expiration of the opt-out period, award the Late Pay Class treble liquidated damages pursuant to Mass. Gen. Laws ch. 149, § 150, and Reuter, on the wages paid late in each violation pay period ($8,200,415.65) in the aggregate, in single damages, calculated from Hitachi's own payroll records, SMF ¶ 146, computed ministerially for each class member on a schedule the parties will propose, with reasonable attorneys' fees and costs to be sought by separate petition under § 150.

Respectfully Submitted,
Plaintiff, Volkan Turgut, individually, and
on behalf of others similarly situated,

By his attorneys,

*/s/ Ilir Kavaja*
Ilir Kavaja, BBO No. 682574
Kavaja Law, P.C.
92 State Street, 8th Floor
Boston, MA 02109
(617) 515-5545
ilir@kavajalaw.com

*/s/ Eric R. LeBlanc*
Eric R. LeBlanc, BBO No. 666786
William E. Petrone, BBO No. 711524
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
(617) 577-8800
eleblanc@bennettandbelfort.com
wpetrone@bennettandbelfort.com

## CERTIFICATE OF SERVICE

I, Eric R. LeBlanc, hereby certify that on this 14th day of July 2026, the foregoing document was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, and will be sent electronically to all counsel of record as registered participants identified on the Notice of Electronic Filing.

*/s/ Eric R. LeBlanc*
Eric R. LeBlanc

## L.R. 7.1 CERTIFICATE

I, Eric R. LeBlanc, certify that in May and June of 2026, counsel for both Parties conferred, both in person and via video conference, about the substance of this Motion and were not able to narrow or resolve the disputes.

*/s/ Eric R. LeBlanc*
Eric R. LeBlanc